IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

TERRY L. RAINEY,

    Plaintiff,

v.                                         Civil Action No. CV-99-J-3220-NE

THE CITY OF HUNTSVILLE,
ALABAMA,

    Defendant.

## MEMORANDUM OPINION

Currently pending before the court is the defendant's motion for summary judgment (doc. 67), evidentiary materials in support of its motion (doc. 69), and memorandum of law. The plaintiff submitted a brief in opposition thereto. The court has reviewed the motion, the memoranda of law, and the evidentiary submissions of the parties. Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that the defendant's motion for summary judgment is due to be **GRANTED**.

### I. Factual Background

The City of Huntsville ("COH") is a municipality governed by a mayor and a City Council. COH has approximately two-thousand employees spread out among twenty-two departments. Ex. E, Spencer depo. at 12.[1] The heads of these departments

---

[1] Loretta Spencer is the current Mayor of COH. Spencer depo. at 8.

report directly to the Mayor. *Id.* at 11-12. One of the departments is the Public Works Services Department ("PWS"). Within the PWS exist various divisions, which, until late 1994 or early 1995, included the Water Pollution Control Division ("WPC") and the Sewer Division. Ex. A Rainey depo. at 28-29, 35. In late 1994 or early 1995, after a city wide reorganization, the Sewer division merged with the WPC. Ex. A Rainey depo. at 42, 51.

Plaintiff, Terry L. Rainey, began working as an electrician for COH on February 6, 1984. Second Amended Complaint at ¶8. In 1985, plaintiff was promoted to the position of Superintendent of the Sewer Division. *Id.* at ¶ 9. When the Sewer Division merged with the WPC, plaintiff assumed the title of Sewer Collection Supervisor. Ex. A Rainey depo. at 31, 33. Though plaintiff was no longer a superintendent, he remained at the same pay grade and step. Ex. B Rainey depo. at 68. As part of the reorganization, plaintiff came within the WPC's chain of command. Ex. A Rainey depo. at 59. Plaintiff's immediate supervisor became William Thomas. Ex. D, Thomas depo. at 21. Thomas's supervisor was Shannon Dickinson, and Dickinson's supervisor was Wendell "Butch" Stokes. *Id*; Stokes depo. at 18. Stokes, as department head, reported directly to the Mayor of Huntsville. Spencer depo. at 12.

In November or December, 1993, plaintiff first complained to Stokes that Shannon Dickinson was using COH resources to benefit his private company, Water Pollution Control, Inc. Ex. A, Rainey depo. at 89-92; Second Amended Complaint

at ¶¶23-28. In 1994 and 1995, plaintiff continued making complaints to COH officials that Dickinson and other COH employees were misusing COH resources for the benefit of Dickinson's corporation. Ex. A, Rainey depo. at 124-130. Plaintiff alleges that as a result of his numerous complaints, Dickinson, Thomas, and Stokes retaliated against him. *Id.* at 84-85.

The plaintiff alleges that the first instance of retaliation came in September, 1994, when Dickinson verbally reprimanded him without justification over an error in the invoicing of a new city vehicle for plaintiff. Ex. A, Rainey depo. at 170. The acts of retaliation continued with Dickinson making it known that he intended to force plaintiff from his job. Second Amended Complaint at ¶35. Dickinson, Stokes, and Thomas committed additional acts of retaliation between September, 1994 and October, 1999. Ex. A, Rainey depo. at 170-191. The parties are in agreement that at issue here are solely the acts of retaliation occurring after December 2, 1997.[2]

COH's Personnel Policies and Procedures Manual ("Personnel Manual") establishes a grievance procedure by which employees may air their concerns over treatment by their supervisors. Ex. WW, Personnel Manual §§ 14.1, 14.2. The Personnel Manual affords a grievance for "[o]ppression, coercion, reprisal or retaliation by a supervisor against an employee for any reason." *Id.* at § 14.1(4). The

---

[2]The plaintiff does not dispute that the allegations of retaliation occurring before December 3, 1997, are barred by the statute of limitations.

3

department head or the director of human resources is responsible for investigating the grievance. *Id*. at § 14.2. "All grievances must be filed within thirty (30) days after the situation complained of has occurred." *Id*. If an employee disagrees with the answer to the initial investigation, the employee may appeal to the personnel committee, and then to the City Council. *Id*. The decision of the City Council is the final decision within the grievance procedure. *Id*.

Plaintiff filed his first grievance on January 17, 1997, which is not at issue in this case. *See* n. 1, *supra*. On December 21, 1998, plaintiff filed a second grievance which alleged he was unofficially demoted so city employees associated with Dickinson's private company could be promoted. *See* Ex. V and X. The December 21 grievance also complained of his job reclassification in 1994, and the effects the change in job classification had upon his job responsibilities. This grievance further alleged retaliation for having cooperated in an unnamed investigation, and that the PWS allowed a misuse of COH resources by a private corporation. Ex. X. This complaint was investigated by James Cunningham, City Engineer, and temporary department head of PWS. Ex. Y. Cunningham found that most of plaintiff's complaints fell outside the thirty day time limitation set forth in the Personnel Manual. Additionally, he noted that plaintiff failed to provide sufficient evidence to investigate plaintiff's complaints. Ex. Y.

On April 19, 1999, plaintiff filed a third grievance, complaining that his secretary had been subject to abuse by Shannon Dickinson in retaliation for his December, 19998 grievance. Ex. Z. On April 29, 1999, Cunningham responded that since the alleged retaliatory action did not concern plaintiff, there was no violation of § 14.1 of the Personnel Manual. Ex. AA. On April 20, 1999, plaintiff filed a fourth grievance in which he complained that Dickinson denied him compensatory time in retaliation for his reactivated grievance. Ex. BB. This complaint was investigated by Cunningham, who found the claim meritless as plaintiff failed to receive pre-approval of compensatory time as required by Dickinson for all supervisors. Ex. CC. On May 7, 1999, plaintiff filed a fifth grievance complaining that Dickinson denied him the purchase of equipment in retaliation for his December, 1998 grievance. Ex. DD. Cunningham investigated and informed plaintiff that Dickinson was "within his management rights to exert controls over expenditures that he deemed to be unjustified or wasteful." Ex. EE.

On May 13, 1999, plaintiff filed a sixth grievance alleging a refusal to fill vacancies in the Sewer Division while vacancies within other division of the Water Pollution Control Department were filled. Plaintiff believed this also constituted retaliation by Dickinson for the December, 1998 grievance. Ex. FF. Cunningham responded on May 24, 1999 that vacant positions were not to be filled unless they constituted a critical function. Cunningham emphasized that the decision not to hire

was his, and that Dickinson played no role in that decision. Ex. GG. He further stated that he had informed plaintiff of his decision to fill only vacancies which constituted critical functions earlier in the year. *Id.*

On June 9, 1999, plaintiff filed a seventh grievance that Dickinson and other employees assigned skilled employees to janitorial work. Ex. JJ. The plaintiff withdrew this grievance. Ex. KK. Finally, on March 29, 2000, plaintiff filed his eighth grievance that positions under his command were being eliminated and he suspected Dickinson's private company of influencing the decision. Ex. LL. The Human Resources Director, Mia Puckett, found the grievance without merit as the positions were not funded in COH's budget. Ex. MM.

Plaintiff appealed the results of every grievance to the Personnel Committee except the grievances of June 9, 1999 and March 29, 2000. Ex. HH, II, NN. At the hearing, plaintiff voluntarily withdrew the grievances of January 17, 1997 and May 7, 1999. Ex. NN. The Personnel Committee rejected plaintiff's appeal. *Id.* at 10. The plaintiff appealed to the City Council as the final decision maker, but withdrew his appeal on June 19, 2000 as he was no longer employed by COH.[3] Ex. RR.

In addition to his grievances, plaintiff complained of Dickinson's behavior to several city officials. Sometime between 1994 and 1996, plaintiff spoke with Mia

---

[3]The plaintiff resigned effective April 28, 2000. Ex. KKK.

6

Puckett in COH's legal department. Ex. A, Rainey depo. at 126-127. In late 1995, or early 1996, Peter Joffrion, City Attorney, became aware of allegations of Dickinson's misconduct. Ex. I, Joffrion depo. at 7-8. Joffrion learned of Dickinson's misconduct both through plaintiff's allegations of misuse of city resources and retaliation and through a suspicious request for travel reimbursement. *Id.* at 8-9. Joffrion stated that he went to then Mayor Steve Hettinger and they decided to proceed with an investigation into Dickinson. *Id.* at 10.

In the fall of 1996, plaintiff raised his concerns and complaints with the newly elected mayor of Huntsville, Loretta Spencer.[4] Ex. E, Spencer depo. at 18. During the meeting, plaintiff discussed the harassment he had been receiving from Dickinson.[5] *Id.* at 47. In response to plaintiff and other employees' reports and allegations, Mayor Spencer began "[p]ursuing the dismissal of Shannon Dickinson." *Id.* at 59. Spencer opined that "the sooner we could dismiss [Dickinson], the happier everyone would be. And that was what I was trying to show them in confidence was that we were taking action." *Id.* at 95.

---

[4]Spencer testified that everyone she met with at that time drew connections between their treatment and the issues surrounding Dickinson. Spencer depo. at 48-49, 51-54. Plaintiff as well as other employees all alleged that they were retaliated against for reporting illegal activity by Dickinson. *Id.* at 58-59, 95.

[5]Spencer testified that before she was even sworn in to the office of Mayor in 1996 she was informed the FBI had an ongoing investigation into the Sewer Department. Spencer depo. at 26-29.

The first investigation into Dickinson concluded in March, 1997, with several disciplinary charges brought against him for his improper use of city time and resources. Ex. M, Fortner affidavit, Tab 1. Stokes, as department head, recommended Dickinson's termination, and he was in fact terminated. Ex. H, Dickinson depo. at 51, Fortner affidavit, tab 2. On appeal, the City Council withdrew the termination and instead suspended Dickinson for six months without pay and demoted him two pay grades, effective May 9, 1997. Joffrion depo. at 16, 18; Fortner affidavit, Tab 3.[6] After his suspension ended in November, 1997, Dickinson went on sick leave beginning in November, 1997. Joffrion depo. at 18. In March, 1998, while Dickinson remained on sick leave, the COH launched a second investigation into Dickinson to determine if he was using his sick time to benefit his private company, Water Pollution Control, Inc. Fortner affidavit, Tab 4. As a result of the investigation, Dickinson was suspended with pay. *Id.* At the hearing on the second disciplinary charge, insufficient evidence was found to take action against Dickinson. *Id.* at ¶8 and Tab 5. Dickinson was ordered to return to work in June, 1998. *Id.*, Tab 5.

Dickinson was transferred out of WPC on June 9, 1999. Fortner affidavit, Tab 6. The COH then brought a third set of disciplinary charges against Dickinson in

---

[6] Danny Fortner is the Deputy Director of Human Resources for the City of Huntsville. He is one of the persons in custody and control of COH records regarding personnel administration and disciplinary proceedings.

October, 1999 for falsification of time cards and abuse of sick leave. *Id.,* Tab 7. On December, 6, 1999, the COH terminated Dickinson's employment. Ex. F, Cunningham depo. at 44; Fortner affidavit, Tabs 7-10.

## II. Standard of Review for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party to "go beyond the pleadings and by . . . affidavits, or by the

'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed.R.Civ.Pro. 56(e). In meeting this burden the non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.Pro. 56(c); *Matsushita*, 475 U.S. at 587. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

On motions for summary judgment, the court shall construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. SH. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249. The basic issue before the court on a motion for summary

judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### III. Legal Analysis

The plaintiff filed his initial complaint on December 3, 1999. Although plaintiff claims that acts of retaliation began against him in 1994, plaintiff seeks damages only for claims accruing after December 2, 1997.[7] *See* Pla. Brief at 11. The sole remaining claim in this action is a 42 U.S.C. § 1983 claim against COH.[8] The plaintiff alleges that COH's failure to adequately supervise Dickinson, Thomas, Stokes, and other Water Pollution Control, Inc., employees led to continual acts of retaliation against him; that the inadequate supervision was so settled and permanent that it became a custom in violation of plaintiff's rights; and that COH was deliberately indifferent to the plaintiff's First Amendment rights.[9] *See* Second

---

[7]The alleged acts of retaliation made before December 3, 1997 would be barred as the statute of limitations for actions brought pursuant to 42 U.S.C. § 1983 is two years.

[8]Count I of the Second Amended Complaint against the City of Huntsville remains. Plaintiff dismissed his claims against defendants Water Pollution Control, Inc., Wendell Stokes, and William Thomas on February 13, 2002. The claim against defendant Shannon Dickinson was dismissed by the court on January 29, 2001.

[9]Plaintiff also argues that "Rainey admits that Dickinson was the cause of the problem and the termination of Dickinson would have been a suitable response by the COH to remedy the problem, Dickinson was not terminated until after Rainey's resignation." Plaintiff's response at 20. However, the evidence establishes that Dickinson was terminated on December 6, 1999 and the plaintiff thereafter resigned

Amended Complaint at ¶116; plaintiff's response at 21. Defendant makes two arguments in support of granting summary judgment: (1) there can be no liability for COH because there was no underlying constitutional violation and (2) COH was not deliberately indifferent towards plaintiff's First Amendment rights.

When a § 1983 claim is asserted against a municipality, the court must examine two different issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 120, 112 S.Ct. 1061, 1066; 117 L.Ed.2d 261 (1992).

The defendant argues, and plaintiff agrees, that First Amendment retaliation claims are analyzed using a four stage analysis. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1988).

Assuming, without deciding, that plaintiff could establish his retaliation claim in violation of the First Amendment under the *Bryson* analysis, plaintiff still must demonstrate that the City of Huntsville was responsible for the violation. In order to do so, plaintiff must show that a municipal custom or policy represents the moving force behind the constitutional violation. *See Monell v. Department of Social*

---

effective April 28, 2000.

*Services*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036-37, 56 L.Ed.2d 611 (1978); *Collins*, 503 U.S. at 120-121, 112 S.Ct. at 1066.

Plaintiff argues that defendant is liable under § 1983 because "of its failure to adequately and properly supervise Dickinson, Thomas, Stokes and other Water Pollution Control Division employees . . . in the prevention and correction of the violations of the plaintiff's First Amendment Rights." Second Amended Complaint at ¶113. However, none of these individuals was a final policymaker for the defendant. "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924 (1988); citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986). *See also Scala v. City of Winter Park*, 116 F.3d 1396, 1403 (11th Cir. 1997) (The mere failure to investigate the basis of a subordinate's discretionary decision does not amount to delegation of policymaking authority). A municipality may not be held liable solely because it employs a tortfeasor, in other words, respondeat superior liability will not attach under § 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989).

"There are 'limited circumstances' in which a local government will be held liable because it inadequately trained or supervised its employees, who then infringed upon a plaintiff's constitutional rights." *Thomas v. Roberts*, 261 F.3d 1160, 1173 (11th

13

Cir. 2001). "[T]hese limited circumstances occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

The Eleventh Circuit Court of Appeals has noted that a municipality will rarely have an express policy of negligent supervision. *Gold,* 151 F.3d at 1350. Therefore, plaintiff may show deliberate indifference by presenting "some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action (citations omitted)." *Id.*

In this case, defendant took action. Plaintiff complained to city officials and filed grievances pursuant to the Personnel Manual regarding Dickinson's behavior. Plaintiff complained to the City Attorney, Peter Joffrion, in late 1995 or early 1996 of Dickinson's misuse of resources and retaliation. Based upon plaintiff's complaints and other evidence, Joffrion proceeded to speak with with Mayor Hettinger who approved an investigation into Dickinson. Joffrion depo. at 10. In the fall of 1996, when plaintiff, among others, complained to the newly elected Mayor Spencer of Dickinson's retaliatory behavior and harassment, Mayor Spencer began pursuing Dickinson's dismissal. Spencer depo. at 59. Defendant began an investigation into Dickinson in 1997, which resulted in a six month suspension and a demotion of two pay grades.

In March, 1998, while Dickinson was on sick leave, plaintiff wrote a letter to the Mayor complaining of continued harassment. In that same month, defendant began investigating Dickinson a second time, ostensibly due to Dickinson's misuse of sick time. The evidence was determined to be insufficient to bring charges. In June, 1999, Dickinson was transferred out of the WPC. In October, 1999, defendant brought a third set of disciplinary charges against Dickinson that led to his termination in December, 1999. The defendant undertook an immediate investigation of each of plaintiff's grievances and altered him to the outcome of each. Additionally, defendant terminated Dickinson. These actions fail to show an indifference to plaintiff's first amendment rights or a deliberate choice by the municipality to take no action. *See Gold*, 151 F.3d at 1350.[10]

Pursuant to the Personnel Manual, each of plaintiff's grievances, except the grievance of March 29, 2000, was investigated by the head of the department, James Cunningham. The March 29, 2000 grievance, filed almost four months after Dickinson was fired, was investigated by the Mia Puckett, Human Resources Director. All grievances were found to be without merit as they either fell within the discretion

---

[10]Plaintiff argues that had the COH transferred Dickinson out of the WPC in October, 1996, "the constitutional violations that occurred on or after October of 1996 would not have occurred." Plaintiff's response at 21. Yet, on March 29, 2000, plaintiff filed a grievance alleging positions under his command were being eliminated at Dickinson's behest. Dickinson, however, had been transferred out of the WPC *almost ten months* before this grievance.

of the decision maker or were time barred pursuant to the Personnel Manual. Plaintiff, appealed the decisions to the Personnel Committee. The Personnel Committee agreed with the findings of the initial investigation. Plaintiff then appealed four of his grievances to the City Council but withdrew them upon his resignation. The City Council, representing the final policymaking authority regarding employee grievances, never had the opportunity to investigate plaintiff's complaints. *See* Ex. WW, Personnel Manual at § 14.2.

These facts present two problems for plaintiff's case. First, defendant adopted and implemented an administrative policy to address plaintiff's grievances. Plaintiff followed this procedure and his grievances were investigated. Additionally, the City Council never had the opportunity to review plaintiff's grievances. Since no decision was made by the final policymakers, the city cannot be liable pursuant to § 1983 as a matter of law. *See Praprotnik*, 485 U.S. at 129-30, 108 S.Ct. at 927-28.

Based on the above, the court finds that defendant was not deliberately indifferent to plaintiff's First Amendment rights. Plaintiff chose not to file a grievance until 1997, three years after he alleges Dickinson began retaliated against him. Plaintiff's complaints of Dickinson's misuse of funds and retaliatory harassment led in part to several investigations that resulted in Dickinson's discipline and eventual termination. Clearly, Dickinson's involvement in illegal activity itself did not harm plaintiff as an employee of defendant. Thus, defendant had no duty to consider

plaintiff's complaints of retaliation by Dickinson until January, 1997, when plaintiff filed his first grievance. At that point, an investigation of Dickinson was already under way. Under this set of fact, the court finds no genuine issue of material fact from which a jury could find that defendant was deliberately indifferent to the plaintiff's rights and hence impose liability under 42 U.S.C. § 1983.

### IV. Conclusion

The court, finding that there are no genuine issues of material fact in dispute, and that the defendant is entitled to judgment in its favor as a matter of law, **ORDERS** that the defendant's motion for summary judgment is hereby **GRANTED**. The plaintiff's claims are **DISMISSED WITH PREJUDICE.** Each party is to bear its own costs.

**DONE** this __6__ day of March, 2002.

INGE P. JOHNSON
U.S. DISTRICT JUDGE